FAG KUGELFISCHER GEORG SCHAF-
ER KGaA, FAG Italia S.p.A., FAG (U.K.)
Limited, Barden Corporation (U.K.)
Limited, FAG Bearings Corporation and
The Barden Corporation, Plaintiffs,

v.

UNITED STATES, Defendant,

Federal–Mogul Corporation; The
Torrington Company, Defen-
dants–Intervenors.

Slip Op. 96–108.
Court No. 93–08–00493.

United States Court of
International Trade.

July 10, 1996.

**316**

Grunfeld, Desiderio, Lebowitz & Silverman (Max F. Schutzman, Andrew B. Schroth and Mark E. Pardo), New York City, for plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jeffrey M. Telep); of counsel: Thomas H. Fine, Michelle Behaylo, David Ross and Stacy J. Ettinger, for defendant.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson, Larry Hampel and Joseph A. Perna, V), Washington, DC, for defendant-intervenor Federal–Corporation.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine, Geert De Prest and Myron A. Brilliant), Washington, DC, for defendant-intervenor The Torrington Company.

### OPINION

TSOUCALAS, Judge:

Plaintiffs, FAG Kugelfischer Georg Schafer KGaA, FAG Italia .S.p.A., FAG (U.K.) Limited, Barden Corporation (U.K.) Limited, FAG Bearings Corporation and The Barden Corporation (collectively "FAG"), commenced this action challenging certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final results of administrative review entitled *Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order ("Final Results")*, 58 Fed.Reg. 39,729 (1993), as amended, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 58 Fed.Reg. 42,288 (1993), *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 58 Fed.Reg. 51,055 (1993), and *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 59 Fed.Reg. 9,469 (1994).

### Background

On May 15, 1989, Commerce issued antidumping orders covering antifriction bearings ("AFBs") (other than tapered roller bearings) from Germany. *See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany*, 54 Fed.Reg. 20,900 (1989).

On April 27, 1993, Commerce published the preliminary results of its administrative review of antidumping duty orders on AFBs (other than tapered roller bearings) and parts thereof from Japan, France, Germany, Italy, Romania, Singapore, Sweden, Thailand and the United Kingdom. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty, Administrative Reviews and Partial Termination of Administrative Reviews*, 58 Fed.Reg. 25,616 (1993).

On July 26, 1993, Commerce published the Final Results at issue. *See Final Results*, 58 Fed.Reg. at 39,729. FAG now moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record alleging the

following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) basing assessment rate on calculated entered values rather than on actual entered values; (2) including sales of certain needle roller bearings in the final margin calculation for cylindrical roller bearing sales; (3) adding an eight percent profit amount as best information available ("BIA") to the actual cost of related party inputs; (4) calculating a merged dumping margin for FAG (U.K.) Limited and Barden Corporation (U.K.) Limited; (5) deducting U.S. direct selling expenses from exporter's sales price ("ESP") rather than adding them to foreign market value ("FMV"); and (6) committing a clerical error.

### Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. *Calculation of Assessment Rate*

■ In the Final Results, Commerce explained its methodology for calculating assessment rates as follows:

> For ESP sales (sampled and non-sampled), we divided the total dumping margins for the reviewed sales by the total entered value of those reviewed sales for each importer. We will direct Customs to assess the resulting percentage margin against the entered Customs values on each of that importer's entries under the relevant order during the review period. While the Department is aware that the entered value of sales during the period of review (POR) is not necessarily equal to the entered value of entries during the POR, use of entered value of sales as the basis of the assessment rate permits the Department to collect a reasonable approximation of the antidumping duties that would have been determined if the Department had reviewed those sales of merchandise actually entered during the POR.

*Final Results,* 58 Fed.Reg. at 39,732.

FAG objects to Commerce's methodology for calculating assessment rates arguing that Commerce should have divided the total dumping margins by the actual entered value of bearings imported during the period of review. According to FAG, Commerce's use of total entered value is inconsistent with the requirements of 19 U.S.C. § 1673e(a)(1) (1988) and may result in either the under-collection or overcollection of antidumping duties. Pls.' Mem.Supp.Mot.J.Agency R. at 11–19.

FAG raised this identical issue in a previous case before this Court regarding the second administrative review. This Court upheld Commerce's methodology as being consistent with law. *FAG Kugelfischer Georg Schafer KGaA v. United States,* 19 CIT ——, Slip Op. 95–158, 1995 WL 549119 (Sept. 14, 1995), *aff'd,* 86 F.3d 1179, 1996 WL 267277 (Fed.Cir.1996). The Court adheres to its prior decision and, therefore, finds Commerce's methodology to be supported by substantial evidence on the agency record and in accordance with law.

### 2. *Inclusion of Needle Roller Bearings*

On December 23, 1991, Commerce made a determination in response to a scope ruling request submitted by FAG concerning certain needle bearings, holding that for purposes of the AFBs antidumping order, needle roller bearings with a length-to-diameter ratio of 4 to 1 or less were considered cylindri-

cal roller bearings. *See Final Determination on the Request by FAG for Exclusion of Certain Engine Crank Shaft and Engine Main Shaft Pilot Bearings from the Scope of Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany ("Final Scope Determination")*, Gen. Issues P.R. Document No. 35, Exhibit 2. On September 2, 1992, Commerce sent a letter to FAG and other interested parties clarifying the scope ruling stating that the ratio of 4 to 1 is a dispositive ratio and the standard to be applied in all circumstances for distinguishing between needle roller bearings and cylindrical roller bearings. Gen.Issues P.R. Document No. 11, Fiche 3, Frame 10. As a result of the above decision, Commerce included within the scope of the determination at issue cylindrical roller bearings with a length-to-diameter ratio of 4 to 1 or less. *Final Results,* 58 Fed.Reg. at 39,785.

FAG disputes Commerce's decision to include these bearings within the scope of the order arguing that Commerce inappropriately applied a scope ruling retroactively. FAG insists that Commerce's retroactive application of the scope ruling violates principles of due process and equity because FAG could not have known at the time of the third period of review that the bearings at issue would be subject to the collection of antidumping duties. As such, FAG claims that Commerce deprived respondents of the opportunity to remedy market behavior in order to ease the impact of dumping duties. Pls.' Mem.Supp.Mot.J.Agency R. at 22–25.

FAG further claims that Commerce's decision to include the bearings within the scope of the review contravenes the statutory requirements for conducting an administrative review. *Id.* at 26 (referring to 19 U.S.C. § 1675(a)(2) (1988)). FAG argues that Commerce violated the statute by incorporating into the review proceedings entries which were already liquidated as non-scope merchandise. Pls.' Mem.Supp.Mot.J.Agency R. at 25–27.

In the alternative, FAG urges the Court to limit the application of the scope determination to sales involving the merchandise made after December 23, 1991. *Id.* at 28. FAG maintains that the Court should at least order Commerce to exclude the sales at issue from the calculation of FAG's ESP assessment rate because at the time of entry the bearings at issue were categorized by the United States Customs Service ("Customs") as non-scope merchandise. FAG concludes that "principles of equity and fairness require a prospective application of ITA's change in class or kind definition." *Id.* at 29.

Commerce responds that when it determined that bearings with a length-to-diameter ratio of 4 to 1 or less were properly classifiable as cylindrical roller bearings, it merely clarified that such bearings were actually within the order's scope. Commerce explains that the purpose of a scope determination is to clarify the coverage of an existing order. According to Commerce, it was required by the statute to review each entry of the subject merchandise that, even before the clarification, was always subject to the outstanding order. Def.'s Opp'n to Pls.' Mot.J.Agency R. at 21–23 (referring to 19 U.S.C. § 1675(a)(2)). Commerce also emphasizes that the statute does not limit Commerce's review to unliquidated entries. Def.'s Opp'n to Pls.' Mot.J. Agency R. at 24–25.

Commerce further maintains that FAG should have been on notice that Commerce might find bearings with a 4 to 1 or less length-to-diameter ratio to be within the scope of the order since FAG requested the scope review on August 8, 1990 (approximately nine months prior to the period of review). *Id.* at 25. Even if FAG did not have proper notice, Commerce points out that FAG could have reduced the impact of antidumping duties by refraining from selling the subject merchandise at less than fair value prices. *Id.*

Finally, Commerce rebuts FAG's alternative argument by stating that it is irrelevant that Customs' classification differs from Commerce's in determining whether Commerce may review sales of merchandise for purposes of assessing antidumping duties that Commerce finds are within the scope of an antidumping order. Commerce contends that a classification by Customs does not

govern an antidumping determination regarding class or kind. *Id.* at 25–26.

Defendant-intervenor The Torrington Company ("Torrington") supports Commerce's decision to include the sales of cylindrical roller bearings in its assessment of antidumping duties where the roller length-to-diameter ratio was less than 4 to 1. Def.–Int. Torrington's Opp'n to Pls.' Mot.J.Agency R. at 14–16.

In rebuttal, FAG argues that Commerce's regulations clearly specify that a scope ruling affects only entries made on or after the date of the ruling. Pls.' Reply to Opp'n to Mot.J.Agency R. at 12 (citing 19 C.F.R. § 353.29 (1993)).

■ This Court has repeatedly held that Commerce has inherent authority to define the scope of an antidumping duty investigation. *NTN Bearing Corp. of Am. v. United States,* 14 CIT 623, 627, 747 F.Supp. 726, 731 (1990) (and cases cited therein). To determine whether a particular class or kind of foreign merchandise falls within the scope of an investigation, Commerce examines the description of the merchandise contained in the petition. *See Mitsubishi Elec. Corp. v. United States,* 12 CIT 1025, 1027, 700 F.Supp. 538, 541 (1988), *aff'd,* 898 F.2d 1577 (Fed.Cir. 1990). "The determination as to whether a product is covered by an antidumping investigation is one which the ITA must make with ample deference to the intent of the petition." *Torrington Co. v. United States,* 16 CIT 99, 105, 786 F.Supp. 1021, 1026 (1992) (citations omitted), *dismissed,* 16 CIT 861, 802 F.Supp. 453 (1992). Although Commerce has the authority to clarify the scope of an antidumping duty determination, Commerce may not alter the scope of a pre-existing order "in a way contrary to its terms." *Smith Corona Corp. v. United States,* 915 F.2d 683, 686 (Fed.Cir.1990).

■ In light of the fact that Commerce is not permitted to alter the scope of a pre-existing order but, rather, only has the authority to clarify the scope of the order,

FAG's contentions are without merit. By definition, a scope ruling is a determination intended to clarify the scope of a pre-existing order. *See* 19 C.F.R. § 353.29.[1] Once Commerce determines through a scope ruling that a particular product is indeed covered by the order, Commerce cannot exclude such merchandise from the order when determining the proper amount of antidumping duties. Section 1675(a)(2), Title 19, United States Code, requires Commerce to consider each entry subject to the order in its calculation of antidumping duties:

> For the purpose of [determining the amount of any antidumping duty], the administering authority shall determine—
>
> > (A) the foreign market value and United States price of *each entry of merchandise subject to the antidumping duty order* and included within that determination, and
> >
> > (B) the amount, if any, by which the foreign market value of *each entry* exceeds the United States price of the entry.
>
> The administering authority ... shall publish notice of the results of the determination of antidumping duties in the Federal Register, and *that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties.*

(Emphasis added).

This Court has upheld Commerce's decision to include roller bearings with a length-to-diameter ratio of 4 to 1 within the scope of this antidumping order. *Koyo Seiko Co. v. United States,* 17 CIT 1076, 834 F.Supp. 1401 (1993), *aff'd,* 31 F.3d 1177 (Fed.Cir.1994). FAG does not dispute the validity of the scope ruling itself and, therefore, claims that the decision in the *Koyo* case is irrelevant to the issue presented in this case. However, implicit in the decision in *Koyo* is that Commerce did not improperly expand the scope

---

1. 19 C.F.R. § 353.29 sets forth the regulations for scope determinations. If Commerce decides to conduct a scope inquiry, 19 C.F.R. § 353.29(d)(5) requires the Secretary to issue "a final ruling as to whether the product which is

the subject of the scope inquiry is *included in the existing order,* including an explanation of the factual and legal conclusions on which the final ruling is based." (Emphasis added).

of the existing order by deciding to include roller bearings with a length-to-diameter ratio of 4 to 1 within the scope of the order. The logical conclusion is that the bearings at issue were always included within the scope of the order and Commerce's scope determination merely clarified that fact.

Further, once such a finding is made, it would be incongruous not to permit Commerce to assess antidumping duties on the basis of these bearings for all investigations conducted pursuant to the order. As Commerce notes, it cannot assess dumping duties against previously-liquidated merchandise, but it is required to include sales information for the liquidated merchandise that is within the scope of the order for purposes of calculating assessment rates for remaining unliquidated entries and cash deposits for future entries. Any other result would permit too large of a windfall for a respondent participating in an antidumping duty review.

■ The Court also rejects FAG's alternative argument that the sales at issue should only be included in the computation of the future deposit rate and should be excluded from the calculation of FAG's ESP assessment rate because FAG entered the merchandise according to the classification by Customs. While Customs' classification of particular merchandise is a consideration for Commerce in making a scope determination, it is not a dispositive factor. *See Smith Corona Corp.*, 915 F.2d at 687. This Court has noted that "[i]t is well-settled that a tariff classification by the Customs Service does not govern an antidumping determination regarding class or kind." *Torrington Co. v. United States*, 14 CIT 507, 512, 745 F.Supp. 718, 722 (1990) (citations omitted). The Court continued by stating: "It is the responsibility of ITA to interpret the term class or kind in such a way as to comply with the mandates of the antidumping laws, not the classification statutes." *Id.* at 512–13, 745 F.Supp. at 722. The Court further noted that "antidumping determinations 'may properly result in the creation of classes which do not correspond to classifications found in the tariff schedules or may define or modify a known classification in a manner not contemplated or desired by the Customs Service.' "

*Id.* at 513 n. 7, 745 F.Supp. at 722 n. 7 (citing *Royal Business Machines, Inc. v. United States*, 1 CIT 80, 87 n. 18, 507 F.Supp. 1007, 1014 n. 18 (1980), *aff'd*, 669 F.2d 692 (1982)). In light of this well-settled law, FAG's reliance on the Customs' classification was misplaced and, therefore, cannot support FAG's claim of unfairness. FAG's complaints concerning lack of notice are further undercut by its own request for a scope determination on August 8, 1990. *See Final Scope Determination*, Gen. Issues P.R. Document No. 35, Exhibit 2, at 1. This request demonstrates that FAG was aware that Customs' classification of the merchandise is not controlling and that Commerce may have had a different interpretation of the statute.

For the reasons explained above, the Court finds Commerce's decision to include within the scope of the Final Results cylindrical roller bearings with a length-to-diameter ratio of 4 to 1 or less to be supported by substantial evidence on the agency record and in accordance with law.

3. *Addition of Eight Percent Profit Amount*

■ In the Final Results, Commerce added an eight percent profit amount as BIA to the actual cost of related party inputs when calculating constructed value for FAG Italia S.p.A. ("FAG–Italy"). *Final Results*, 58 Fed.Reg. at 39,755. FAG takes issue with Commerce's action claiming that FAG–Italy responded completely and accurately to the section of Commerce's questionnaire dealing with related party inputs. FAG explains that it provided cost of production data for related party inputs because no independent market existed for such inputs and, therefore, no fair market price existed with which to compare transfer prices. FAG further emphasizes that Commerce accepted FAG's cost of production data for purposes of the preliminary determination and never indicated any deficiencies in FAG's questionnaire response concerning related party inputs. Pls.' Mem.Supp.Mot.J.Agency R. at 30–35.

Commerce admits that its questionnaire was unclear as it appeared to give FAG–Italy the option of reporting either transfer prices or cost of production data. Commerce also concedes that it did not indicate any deficien-

cy in FAG–Italy's response. Consequently, Commerce requests a remand in order to remove the application of BIA from the valuation of FAG–Italy's inputs purchased from related parties. Commerce further states that it has not yet determined whether it is appropriate to use transfer prices if they are higher than cost of production and, therefore, requests a remand to decide this issue as well. Unsure of its reading of *Federal–Mogul Corp. v. United States,* 18 CIT ——, ——, 862 F.Supp. 384, 403–04 (1994), Commerce requests instruction from the Court as to the propriety of adding the minimum eight percent profit twice in the constructed value calculation—once on each related party input and a second time to the total cost of all inputs. Def.'s Opp'n to Pls.' Mot.J.Agency R. at 29–31.

Defendant-intervenor Torrington asserts application of BIA was appropriate because both the statute and Commerce's questionnaire required FAG to report transfer prices for related party inputs. Torrington also supports Commerce's choice of BIA as being reasonable and consistent with the statute. Def.–Int. Torrington's Opp'n to Pls.' Mot.J.Agency R. at 19–24.

Defendant-intervenor Federal–Mogul Corporation ("Federal–Mogul") agrees with Torrington's position on this issue. Def.–Int. Federal–Mogul's Opp'n to Pls.' Mot.J.Agency R. at 13–18.

The relevant statutory provisions are as follows:

**(e) Constructed value**

**(1) Determination**

For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of—

**(A)** the cost of materials ...

**(B)** an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual commercial quantities and in the ordinary course of trade, except that—

. . . . .

**(ii)** the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost;

. . . .

**(2) Transactions disregarded; best evidence**

For the purposes of this subsection, a transaction directly or indirectly between ... [related parties] may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise under consideration. If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then the determination of the amount required to be considered shall be based on the best evidence available. . . .

**(3) Special rule**

If, regarding any transaction between ... [related parties] involving the production by one of such persons of a major input to the merchandise under consideration, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the costs of production of such input, then the administering authority may determine the value of the major input on the best evidence available regarding such costs of production, if such costs are greater than the amount that would be determined for such input under paragraph (2).

19 U.S.C. § 1677b(e) (1988).

The Court addressed this issue in *SKF USA Inc. v. United States,* 19 CIT ——, ——, 888 F.Supp. 152, 155–57 (1995). *SKF* involved the questionnaire response of SKF USA Inc. and SKF GmbH (collectively "SKF") in the same administrative review as the one presently before the Court. The Court determined in *SKF* that Commerce inappropriately applied BIA because the questionnaire was ambiguous and Commerce failed to give any indication that SKF's re-

sponse was deficient. The Court found that where respondents report cost of production instead of transfer prices, and where Commerce has no reasonable grounds to suspect that the value attributed to inputs is less than the cost of producing those inputs, there is no adjustment for profit required in the calculation of cost of production for inputs. *SKF*, 19 CIT at ——, 888 F.Supp. at 156 (citing 19 U.S.C. § 1677b(e)(2) & (3)). However, the Court found that in calculating constructed value for all of the subject merchandise pursuant to 19 U.S.C. § 1677b(e)(1), Commerce must make the necessary adjustment for profit (a minimum of eight percent). Finally, the Court did not discuss the issue of whether Commerce is required to prefer, when considering related party inputs, the transfer price if it is greater than the cost of production since Commerce's choice to rely on cost of production was in accordance with law. *SKF*, 19 CIT at ——, 888 F.Supp. at 156–57.

As the facts in the present case are identical to those in *SKF*, the Court remands this issue for removal of BIA from Commerce's constructed value calculation of related party inputs (its increase of FAG–Italy's value for inputs by a factor of eight percent for profit). Commerce is instructed not to change its profit adjustment to total constructed value made under 19 U.S.C. § 1677b(e)(1)(B)(ii). Finally, on remand, it is not necessary for Commerce to reconsider its decision to rely on cost of production as opposed to transfer prices as its choice in this case is consistent with law.

### 4. *Merged Dumping Margin*

■ Commerce decided to collapse FAG (U.K.) Limited ("FAG–UK") and Barden Corporation (U.K.) Limited ("Barden") for purposes of calculating dumping margins in the Final Results. 58 Fed.Reg. at 39,773–74. FAG objects to Commerce's treatment of FAG–UK and Barden arguing that the two companies qualified for separate treatment. FAG emphasizes that on September 24, 1992, Commerce granted FAG's request to treat FAG–UK and Barden as separate companies for purposes of reporting sales and cost data. While FAG does not dispute the fact that the two companies are related, FAG maintains that Commerce has a practice of calculating separate dumping margins where companies operate as separate and distinct entities and where there is no substantial danger of price manipulation. FAG asserts that Commerce found these conditions to be met by FAG–UK and Barden in the September 24 letter, and that the facts on the record support this conclusion. Pls.' Mem.Supp.Mot.J.Agency R. at 37–41.

In support of its position, FAG insists that no commercial synergy existed between FAG–UK and Barden as Barden continued to operate in the same manner as it had prior to FAG's acquisition of Barden in December 1990. According to FAG, during the third period of review, Barden's day-to-day operations such as management, marketing, sales, distribution, and pricing remained separate and distinct from those of FAG–UK. FAG further argues that FAG–UK and Barden did not share common board members and that there is no evidence that the consolidation of financial statements between a subsidiary and a parent company results in price manipulation. *Id.* at 41–47.

Commerce counters with its concern that granting two related companies separate treatment creates an incentive to evade the dumping order by making U.S. sales through whichever company has a lower margin. In the Final Results, Commerce stated the following with respect to its decision to collapse the two companies:

> After fully considering the information on the record in this review, including FAG KGS's percentage ownership in its U.K. subsidiaries and the fact that the parent and sister companies share common board members, we determined that a strong possibility of prices and costs or production manipulation exists between the related companies.

58 Fed.Reg. at 39,774.

Commerce argues that its decision was consistent with its practice of collapsing related parties because the facts demonstrate that the relationship between the parties is such that there is a strong possibility of manipulation of prices and production decisions that would result in the circumvention

of the antidumping law. Def.'s Opp.'n to Pls.' Mot.J.Agency R. at 32 (citing *Nihon Cement Co. v. United States,* 17 CIT 400, 425–27 1993 WL 185208 (1993)). Commerce explains that its treatment of the related companies was different from the second period of review because the consolidation of the two companies was not complete until the third period of review. Def.'s Opp'n to Pls.' Mot.J.Agency R. at 35–36.

Commerce emphasizes that it considered the totality of the circumstances in determining whether to collapse related parties and that no one factor was dispositive. *Id.* at 33–34. Commerce states that its finding that FAG possesses 100 percent common ownership of its subsidiaries indicated a potential for price and production manipulation. While Commerce recognizes that the consolidation of financial information may not automatically result in price manipulation, Commerce insists that it provided evidence of the potential for price manipulation. In further support of its position, Commerce maintains that the two companies shared board members and that the operations of FAG–UK and Barden were closely intertwined. *Id.* at 36–41.

Defendant-intervenor Federal–Mogul supports Commerce's position on this issue arguing that Commerce's initial decision to permit the two companies to report their information separately did not restrict Commerce's ability to merge the companies later. Federal–Mogul stresses that there was very little substantive information at the time of Commerce's initial decision not to collapse the companies, and that the facts that became apparent during the investigation required Commerce to change its position. Def.–Int. Federal–Mogul's Opp'n to Pls.' Mot.J.Agency R. at 19–20. Torrington also supports Commerce's decision to collapse the companies. Def.–Int. Torrington's Opp'n to Pls.' Mot.J.Agency R. at 28–30.

In general, Commerce does not collapse related parties except where there is a strong possibility of price manipulation. *See Nihon,* 17 CIT at 425; *see also Final Determinations of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Bearings) and Parts Thereof from the Feder-* *al Republic of Germany,* 54 Fed.Reg. 18,992, 19,089 (1989). As explained by the court in *Nihon,* Commerce relies on a variety of factors in determining whether to collapse entities:

> In determining whether to collapse entities, Commerce does not focus solely upon the degree of voting control one company may have over another, but upon a broad analysis of the facts in the case.... Other factors relied upon by Commerce in collapsing related companies are that (1) the companies are closely intertwined; (2) transactions take place between the companies; (3) the companies have similar types of production equipment, such that it could be unnecessary to retool either plant's facilities before implementing a decision to restructure either company's manufacturing priorities; and (4) the companies involved are capable, through their sales and production operations, of manipulating prices or affecting production decisions.

17 CIT at 425 (citations omitted). The court further noted that "[a]ll of these factors need not be present as long as the parties are sufficiently related to present the possibility of price manipulation." *Id.* at 425–26 (citing *Cellular Mobile Telephones and Subassemblies from Japan; Final Results of Antidumping Duty Administrative Review,* 54 Fed.Reg. 48,011, 48,015 (1989)). The court concluded in *Nihon* that Commerce's decision to collapse several companies was not supported by substantial evidence because Commerce had failed to consider any of the above factors. The court stated that "[w]hile each of these criteria did not have to be met, Commerce did have to consider them all." *Id.* at 426.

Commerce cited the following evidence in support of its decision to merge the dumping margins of FAG–UK and Barden:

> Because Barden and FAG–UK have a sister relationship rather than a parent-subsidiary relationship, we examined the relationship of the parent corporation (FAG–Germany) *vis-a-vis* its subsidiaries in assessing the capability of manipulating prices and costs, and affecting production decisions. FAG–UK and Barden are whol-

ly owned by the same parent. We consider this degree of ownership to be a strong indicator of FAG–Germany's potential to control FAG–UK's and Barden's production and pricing decisions. Furthermore, the financial information of the two respondents is consolidated in FAG–Germany's financial statement. Such consolidation constitutes additional evidence that the companies are closely intertwined and have a financial relationship.

The record shows that Barden and FAG–UK share board members with each other and with FAG–Germany who serve important managerial functions. The sharing of board members by two related companies, particularly members with management responsibilities, is evidence that the companies are closely intertwined. It also indicates the capability of FAG–Germany to manipulate prices or affect production decisions regarding the two respondents.

We note that FAG–UK stated in its supplemental response to Section A of the questionnaire that "at times FAG–Germany may direct certain marketing and sales strategies for its European affiliates or make upper-level administrative and management decisions which pertain directly or indirectly to FAG–UK (to this end, FAG–UK's board of directors consists of FAG–UK as well as FAG–Germany personnel)." In addition, FAG–UK explains in its Section A response that the "FAG Bearings Group is composed of an integrated network of full-line producers, exporters and importers, using a worldwide rationalized production system." In its 1990 Annual Report, FAG KGS describes its acquisition of The Barden Corporation as one that "will produce synergies in development and distribution." These statements illustrate FAG–Germany's potential, if not actual, influence over the sales and production activities of its subsidiaries and support the September 18 decision to collapse FAG UK and Barden UK.

58 Fed.Reg. at 39,773–74 (citations omitted). From the above, it seems that Commerce only considered two of the factors listed in *Nihon* —whether the companies were intertwined and the possibility of manipulation.

There is no evidence that Commerce determined either that transactions occurred between the companies or that the companies had similar production equipment. Even the factors Commerce did consider were addressed in a superficial manner. Commerce focused on "potential" rather than "actual" influence that FAG may assert over its subsidiaries. This potential for influence absent consideration of other factors is not enough to create a strong possibility of price manipulation. Further, in *Nihon*, the court found that ownership interest and the overlapping of board members was not enough to create "one of those 'relatively unusual situations, where the type and degree of relationship is so significant that we find there is a strong possibility of price manipulation.'" *Nihon*, 17 CIT at 426–27 (citing *Final Determinations of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Bearings) and Parts Thereof from the Federal Republic of Germany*, 54 Fed.Reg. at 19,089).

The Court has also conducted an independent examination of the record, and has not located substantial evidence supporting Commerce's position. In fact, the record contains evidence directly contradicting Commerce's conclusions in the final determination. For example, FAG's supplemental questionnaire response contains the following description of the relationship between FAG–UK and Barden:

FAG UK and Barden UK act entirely independent of one another; they do not engage in any commercial relations and are related only through corporate familial ties via a common parent. During the third POR, Barden did not sell any bearings made by FAG, and FAG did not sell any bearings made by Barden (in either the U.S. or U.K. markets). Neither influences the other's pricing or marketing strategies, each carries distinct and nonfungible product lines, and each maintains separate billing, accounting and financial records. This was verified by the Department in the second POR and may again be verified in the current POR.

*FAG–UK's Response to the DOC Supplemental Questionnaire*, U.K. P.R. Document

No. 126, Fiche 67–68, Frame 3. In the Final Results, Commerce did not address the day-to-day operations of the companies but, rather, focused on broad concepts concerning FAG's ownership of Barden. In so doing, Commerce failed to address in any manner the above description of the relationship between the two companies.

In addition, in the letter dated September 24, 1992, Commerce granted FAG's request to permit FAG–UK and Barden to submit separate questionnaires stating the following:

> We are basing our decision on the facts presented in your August 20, 1992 letter:
> - that Barden and FAG–UK are each separately owned by FAG Kugelfischer Georg Schafer KGaA (FAG–Germany), and do not have ownership in each other;
> - that their product lines are in no way fungible or interchangeable and are produced by different manufacturers;
> - that their pricing structures are separate and independent;
> - that neither sold each other's bearings.
>
> From this information, it appears that Barden and FAG–UK are distinct entities and that there is no substantial danger of price manipulation.

U.K. P.R. Document No. 53, Fiche 42, Frame 16. In the Final Results, Commerce glossed over the contents of this letter by stating the following:

> We recognize that, when respondents were filing questionnaire responses for the third review, we allowed separate reporting by FAG–UK and Barden. We did so because the two companies indicated that their record-keeping systems were separate and not easily merged for purposes of responding to the questionnaire. However, our decision to allow separate reporting does not preclude our collapsing the two companies in calculating dumping margins.

58 Fed.Reg. at 39,774. While separate reporting may not preclude collapsing the two companies for the purpose of calculating dumping margins, Commerce made no attempt to refute its own conclusion that the two companies were separate and distinct entities and that there was no substantial danger of price manipulation. The scant evidence cited by Commerce in the Final Results was not enough to demonstrate that its original conclusions were incorrect and that a substantial danger of price manipulation indeed existed. Commerce also failed to note that its comments in the September 24 letter tend to demonstrate that two of the criteria in *Nihon* were not satisfied. First, Commerce's statement concerning the products produced by the companies indicates that the companies do not have similar types of production equipment. Second, Commerce's acknowledgment of the independent activities of the companies indicates that few if any transactions occurred between the companies. Commerce did not address either of these factors in the Final Results.

As such, the Court finds that the record does not support Commerce's decision to collapse FAG–UK and Barden. This issue is remanded so that Commerce may calculate separate margins for FAG–UK and Barden.

### 5. *U.S. Direct Selling Expenses*

■ FAG objects to Commerce's decision to deduct direct selling expenses from ESP rather than adding such expenses to FMV. Pls.' Mem.Supp.Mot.J. Agency R. at 47–49. As Commerce points out, subsequent to FAG's filing of its brief, the Court of Appeals for the Federal Circuit ("CAFC") vindicated Commerce's practice. Def.'s Opp'n to Pls.' Mot.J.Agency R. at 41–44 (citing *Koyo Seiko Co. v. United States*, 36 F.3d 1565 (Fed.Cir. 1994)). FAG did not address this issue in its reply brief.

In upholding Commerce's practice of deducting direct selling expenses from ESP, the CAFC stated the following:

> Nothing in the plain language or the legislative history of the Antidumping Act precludes Commerce's approach of adjusting exporter's sales price by deducting therefrom certain direct selling expenses incurred in the United States. Indeed, Commerce's stated rationale for its approach is well within the bounds of reasonableness.

*Koyo,* 36 F.3d at 1575. In light of the decision of the CAFC, the Court sustains Commerce on this issue.

### 6. *Clerical Error*

FAG claims that Commerce committed a clerical error in its Statistical Analysis Software ("SAS") computer program resulting in the merging of sales and cost data bases and the application of a BIA rate to certain U.S. sales where no constructed values were found. FAG points out that on September 17, 1993, this Court ordered that the same error be corrected with respect to FAG–Italy. FAG now requests a remand so that this error may be corrected with respect to FAG–UK. Pls.' Mem.Supp.Mot.J.Agency R. at 50–53. Commerce agrees that a remand is appropriate so that Commerce may correct the SAS programming error. Def.'s Opp'n to Pls.' Mot.J.Agency R. at 44.

The Court agrees with the parties that a clerical error occurred and, therefore, remands this issue to Commerce to correct the SAS programming error so that appropriate matches are made between sales and cost data.

### *Conclusion*

In accordance with the foregoing opinion, this case is remanded to Commerce to: (1) recalculate constructed value for FAG–Italy without applying BIA to the actual cost of related party inputs; (2) calculate separate dumping margins for FAG–UK and Barden; and (3) correct the error in the SAS computer program. Commerce is sustained on all other issues.

Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due.

### *ORDER*

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration, to: (1) recalculate constructed value for FAG Italia S.p.A. without applying best information available to the actual cost of related inputs; (2) calculate separate margins for FAG (U.K.) Limited and Barden Corporation (U.K.) Limited; and (3) correct the error in the Statistical Analysis Software program; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due.

