**GULF STATES TUBE DIVISION OF QUANEX CORPORATION,**
Plaintiff,

v.

**The UNITED STATES and the United States Department of Commerce,**
Defendants,

and

**Dalmine S.p.A, Dalmine USA Inc., and TAD USA, Inc., Defendant–Intervenors.**

Slip Op. 97–124.
Court No. 95–09–01125.

United States Court of International Trade.

Aug. 29, 1997.

---

Schagrin Associates, Roger B. Schagrin, R. Alan Luberda, and John C. Steinberger, Washington, DC, for Plaintiff.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director; Velta A. Melnbrencis, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; Boguslawa B. Thoemmes, Of Counsel, Office of the Chief Counsel for Import Administration, Washington, DC, for Defendant.

Rogers & Wells, William Silverman and Ryan Trainer, Washington, DC, for Defendant–Intervenors.

## *MEMORANDUM AND ORDER*

WALLACH, Judge.

## I

## PRELIMINARY STATEMENT

Plaintiff, Gulf States Tube Division of Quanex Corporation ("Quanex"), and Defendant–Intervenors[1] Dalmine S.p.A., Dalmine USA Inc., and TAD USA, Inc. (collectively "Dalmine"), contest certain aspects of the Department of Commerce, International Trade Administration's ("ITA" or "Commerce") Final Determination in *Small Diameter Circular Seamless Carbon and Alloy Steel, Standard, Line and Pressure Pipe from Italy,* 60 Fed.

---

1. This case was consolidated. As a result, Defendant–Intervenors are also Plaintiffs on certain issues.

Reg. 31,981 (June 19, 1995) ("Final Determination"), as unsupported by substantial evidence and contrary to law. This Court has jurisdiction under 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

Quanex argues that four actions by Commerce were unsupported by substantial evidence on the record and not in accordance with law: (1) the exclusion of certain U.S. sales of subject merchandise from its antidumping calculations; (2) the failure to use best information available ("BIA") to calculate margins for certain unreported U.S. sales; (3) the failure to apply adverse BIA to calculate margins for certain unreported U.S. sales; and (4) the failure to explain its decision to exclude the unreported U.S. sales from the margin calculation.

Dalmine argues that six actions by Commerce were unsupported by substantial evidence on the record and not in accordance with law: (1) the application of adverse BIA as a result of Dalmine's omission of a single sale from its outlier request; (2) the initiation of a below-cost-of-production investigation of Dalmine's home market sales; (3) the calculations of cost of production ("COP") and constructed value ("CV") with respect to Dalmine's galvanized products; (4) the attribution of Instituto per La Riconstruzione Industriale S.p.A.'s ("IRI") interest expenses to Dalmine because IRI is Dalmine's ultimate parent; (5) the reduction of IRI's interest expenses by short-term interest income only; and (6) the rejection as "new" information of certain documents that Dalmine submitted with their Reply Brief during the administrative proceeding.

Dalmine has abandoned its claims that Commerce erred in not reducing Dalmine's general expenses by Dalmine's exchange gains, and that Commerce understated the "CV offset ratio" because it excluded certain categories of accounts receivable from related companies.

For the reasons discussed below, the Court remands to Commerce only on the issue of the calculation of COP and CV with respect to Dalmine's galvanized products. The Court affirms Commerce's actions on all other issues.

## II

### PROCEDURAL BACKGROUND [2]

On June 23, 1994, Quanex filed a petition with Commerce requesting an antidumping investigation of seamless pipe from Italy. Petition from Schagrin Assoc. to Sec. of Commerce ("Petition"), Administrative Record ("AR") Pub. Doc. 1, Fiche 2–3, Fr. 1. Quanex alleged that seamless pipe was being, or was likely to be, sold in the United States at less than fair value, within the meaning of section 731 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673 (1988).

The ITA initiated an antidumping investigation on July 13, 1994, published in Federal Register on July 20, 1994.[3] *Initiation of Antidumping Duty Investigations: Small Diameter Circular Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Argentina, Brazil, Germany and Italy,* 59 Fed.Reg. 37,025 ("Initiation Notice").

Commerce issued a preliminary negative determination on January 27, 1995. *Notice of Preliminary Determination of Sales at Not Less Than Fair Value: Small Diameter Circular Seamless Carbon and Alloy Steel, Standard, Line and Pressure Pipe from Italy,* 60 Fed.Reg. 5358 ("Preliminary Determination"). In the *Final Determination,* however, Commerce determined that Dalmine's weighted-average dumping margin was 1.84 percent. 60 Fed.Reg. at 31,992. Dalmine and Quanex challenge certain aspects of Commerce's Final Determination.

## III

### DISCUSSION

#### A

#### Standard of Review

In reviewing a final ITA determination, this Court will "hold unlawful any determina-

2. Because this case involves many issues, the specific facts involving each issue will be discussed separately.

3. This case is governed by the provisions of the Tariff Act of 1930, as amended, that were in effect prior to 1 January 1995, the effective date of the Uruguay Round Agreements Act, Pub.L. No. 465, 103d Cong., 2d Sess., 108 Stat. 4809 (1994).

tion, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). "Substantial evidence 'is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent the administrative agency's finding from being supported by substantial evidence.'" *Matsushita Elec. Indus. Co. v. United States*, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984) (quoting *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966)).

In reviewing an agency's construction of the statute that the agency administers, the Court's initial inquiry is to determine "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Nat. Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* at 843–44, 104 S.Ct. at 2782. Consequently, "[t]he court will defer to the agency's construction of the statute as a permissible construction if it 'reflects a plausible construction of the plain language of the statute[s] and does not otherwise conflict with Congress' express intent.'" *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed.Cir.1996) (citations omitted).

**B**

**ITA Made A Reasonable Decision To Exclude From Its Antidumping Calculations Certain U.S. Sales of ASTM A–335 Pipe Made During The Period Of Investigation ("POI") Because The Scope Description Provided by ITA Was Ambiguous**

During verification, Commerce discovered that Dalmine failed to report certain U.S. sales of ASTM A–335 pipe used in boiler applications. Commerce determined that the ambiguous scope description contained in the Notice of Initiation and Preliminary Determination caused Dalmine to believe that this merchandise was not included in the investi-

gation, and thus these sales did not need to be reported. Commerce decided to exclude these sales from the calculation of the dumping margin. Quanex contends that Commerce erred in not including these sales and argues that the scope description clearly encompassed this merchandise. For the reasons that follow, Quanex's argument fails.

**1**

**Background**

As proposed by Quanex, "[t]he scope of this petition includes all subject seamless pipe produced to the ASTM A–106, ASTM A–335, ASTM A–53 and API 5L specifications, regardless of application". Petition at 5. The scope also included all products not meeting the ASTM A–106, A–335, A–53 or API 5L standards, but used in the covered applications. *Id.* A footnote to the sentence preceding this description stated:

> In addition, A–106 pipe may be used in some boiler applications. However, this petition is not intended to cover boiler tubing unless such tubing is being used as a substitute in applications covered by this petition.

*Id.* at n. 3.

In defining the scope of the investigation as follows, the ITA slightly modified Quanex's Petition and, in addition to listing ASTM A–106, ASTM A–53, ASTM A–335, and API 5L as covered specifications, stated:

> The following information further defines the scope of these investigations ... A–106 pipe may be used in some boiler applications. The scope of these investigations includes all multiple-stenciled seamless pipe meeting the physical parameters described above and produced to one of the specifications listed above, whether or not also certified to a non-covered specification. Standard, line and pressure applications are defining characteristics of the scope of these investigations. Therefore, seamless pipes meeting the physical description above, but not produced to the A–106, A–53, or API 5L standards shall be covered if used in an A–106, A–335, A–53 or API 5L application.... Specifically excluded from these investigations are boiler

tubing, mechanical tubing and oil country tubular goods except when used in a standard, line or pressure pipe application.

Initiation Notice, 59 Fed.Reg. at 37,026. The scope description contained in the Preliminary Determination was identical to the one contained in the Initiation Notice. 60 Fed. Reg. 5358.

In the Final Determination, Commerce determined that the scope of the investigation included the disputed alloy pipe made to ASTM A–335 specification. 60 Fed.Reg. at 31,981–83. Commerce stated:

> The scope of this investigation includes seamless pipes produced to the ASTM A–335, ASTM A–106, ASTM A–53 and API 5L specifications and meeting the physical parameters described below, regardless of application. The scope of this investigation also includes all products used in standard, line, or pressure applications and meeting the physical parameters below, regardless of specification.
>
> *        *        *        *        *        *
>
> Specifically excluded from this investigation are boiler tubing and mechanical tubing, **if such products are not produced to A–335, A–106, A–53 or API 5L specifications** and are not used in standard, line or pressure applications.

*Id.* at 31,981–82 (emphasis added).

Commerce stated that the scope description contained in the Initiation Notice and Preliminary Determination was ambiguous. *Id.* at 31,987. Commerce decided to exclude the sales of pipe made to A–335 specification which were used in boiler applications for purposes of its final calculation so that Dalmine would not be penalized for a reasonable misunderstanding. *Id.* at 31,987.

Commerce explained:

> Based on the results of the Houston verification, it is apparent that there had been considerable confusion concerning scope coverage. In order to eliminate this confusion, we find it necessary to clarify the scope to make explicit that all products made to ASTM A–335, A–106, A–53 and API 5L are covered, regardless of application, and modify any future suspension of liquidation instructions to Customs.

> **Therefore, considering the ambiguity in the scope language, it is not appropriate to penalize the respondent by including these sales.**

Final Concurrence Mem. of June 12, 1995 at 10, AR Non Pub. Doc. 108, Fiche 104, Fr. 1 (emphasis added). Thus, although Commerce determined that pipe produced to a covered specification but used in a non-covered application is within the scope of the investigation, it excluded these sales from the dumping margin because the scope language was ambiguous. Final Determination, 60 Fed.Reg. at 31,984, 31,987.

**2**

**Commerce Reasonably Determined That The Scope Description Was Ambiguous And Excluded Certain U.S. Sales**

This issue is extremely narrow: whether Commerce may exclude certain U.S. sales from the dumping margin calculation when the respondent's failure to report those sales was due to the ambiguous scope description found in the Initiation Notice and Preliminary Determination. Based on the specific facts of this case, Commerce's actions were reasonable.

■■■■ Commerce, in administering the antidumping duty program, interprets antidumping duty orders and determines which products fall within the scope of the order. *Ericsson GE Mobile Communications Inc. v. United States,* 60 F.3d 778, 783 (Fed.Cir. 1995). In discharging this duty, Commerce "enjoys substantial freedom". *Id.* at 782. Before an antidumping duty order is issued, however, Commerce must define the scope of the investigation and perform its investigation. In accordance with Commerce's freedom to interpret an antidumping duty order, the Court views Commerce's interpretation of its scope description with deference.

■■■ The parties cite numerous places in the record to support their competing contentions that the scope was either ambiguous or clear. For example, Quanex points to appendices I and V of the questionnaire which list ASTM A–335 alloy pipe as a covered specification. Appendix V provides that

some covered products, specifically A–106 pipes, "may be used in some boiler applications." Quanex also argues that Commerce's discussion of the published scope description in the Initiation Concurrence Memorandum put Dalmine on notice of the proper scope description. It describes the scope as follows:

> Petitioner would like the Department to initiate these investigations using a scope that includes any merchandise which (1) meets the physical description of the subject seamless pipe as set forth in the petition, (2) is made to one of the specifications listed in the petition (whether or not also certified to a non-covered specification) **or is used in one of the types of applications listed in the petition, and (3) is not specifically exempted.** Petitioner specifically exempts oil country tubular goods, mechanical tubing and boiler tubing **that is not also certified to one of the covered specifications and that is not used in one of the covered applications.**

Initiation Concurrence Mem. of July 13, 1994 at 4, AR Pub. Doc. 18, Fiche 4, Fr. 85 (emphasis added).

Dalmine, on the other hand, argues that it "informed both ITA and Quanex that it considered various types of boiler products bearing subject stencils to be non-subject merchandise." Mem. of Defendant–Int. Dalmine S.p.A. et al. In Oppos. To Plaintiff's Mot. For Judgment On The Agency Record at 30 ("Dalmine Response"). According to Dalmine, footnote 3 to the petition contributed to its confusion. It states:

> In addition, A–106 pipe may be used in some boiler applications. However, this petition is not intended to cover boiler tubing unless such tubing is being used as a substitute in applications covered by this petition.

Petition at n. 3. Dalmine claims that "Quanex's use of the word 'however' in the footnote logically can only mean that all boiler pipe—including ASTM A–106 boiler pipe—was non-subject merchandise, provided it was not used in a subject application." Dalmine Response at 19–20.

Dalmine also claims that in exhibit 5 to its petition, Quanex noted that excluded boiler products "ha[ve] separate [Harmonized Tariff Schedule] subheadings", which suggested that all pipes to be used in a boiler application were excluded. Dalmine Response at 21. According to Dalmine, Quanex's statement that "[t]he fact that [Tubicar's A–106] boiler tubing products may not be in the scope of the investigation does not prevent them from being used as the basis for foreign market value", Quanex Letter of Sept. 26, 1994 to Sec'y Comm. Objecting to Outlier Request at 3, AR Pub. Doc. 65, Fiche 12, Fr. 1, is an admission that boiler application products bearing a subject stencil are non-subject merchandise. Dalmine Response at 31.

Here, Commerce determined that the scope description "was unclear as to whether the products in question are subject merchandise. The respondent did not report these sales based on its reading of the scope of the initiation ... the scope language in the initiation is ambiguous...." Final Determination, 60 Fed.Reg. at 31,987. In view of the conflicting information above, and because the Court looks upon Commerce's interpretation of its scope description with deference, Commerce's determination that the scope description was ambiguous is reasonable. Commerce clarified the scope description in the Final Determination, thus assuring that the subject merchandise will be included in all subsequent reviews.[4]

---

**4.** As a result of the Court's determination that Commerce's exclusion of the ASTM A–335 pipe used in boiler applications from the antidumping calculations is reasonable, Quanex's claims that Commerce erred (1) in not applying BIA to these sales to calculate a margin and (2) that the BIA used should have been adverse, are moot.

A final determination of dumping may only be based on verified information or the best information otherwise available ("BIA"). 19 U.S.C. § 1677e (1988). BIA is used whenever: (1) ITA is unable to verify the accuracy of information provided in a response, 19 U.S.C. § 1677e(b); (2) a party or any other person "refuses or is unable to produce information requested in a timely manner and in the form required," 19 U.S.C. § 1677e(c), or (3) a party or any other person "significantly impedes an investigation." *Id.*

Here, none of the statutory triggers providing for the application of BIA have been met. Dalmine was not put on notice that the ASTM A–335 pipe used in boiler applications was included in

3

**Although The Narrow Facts Of This Case Support Exclusion Of U.S. Sales Based On Ambiguity In The Scope Description, Most Respondents Will Not Be Able To Meet This Standard**

■ Neither Commerce nor this Court is opening the door for respondents "to control the amount of antidumping duties" by deliberately miscommunicating in order to claim ambiguity in the scope description. *See Persico Pizzamiglio, S.A. v. United States,* 18 CIT 299, 304, 1994 WL 132109 (1994) (citing *Olympic Adhesives, Inc. v. United States,* 8 Fed. Cir. (T) 69, 76, 899 F.2d 1565, 1572 (1990)). A respondent is still responsible for seeking clarification from Commerce in order to create an adequate record. *Chinsung Indus. Co., Ltd. v. United States,* 13 CIT 103, 106, 705 F.Supp. 598, 601 (1989). In this case, however, the Court agrees with Commerce that all of the parties believed in good faith that they were interpreting the scope correctly. As a result, because of its unique facts, this case does not adversely impact those considerations.

C

**Commerce Explained Its Decision To Exclude The Unreported U.S. Sales From The Margin Calculation**

■ The Court rejects Quanex's argument that Commerce failed to explain why it did not calculate a margin for the ASTM A–335 pipe used in boiler applications or include it in its average margin and duty deposit calculations. Quanex admits that Commerce provided an explanation for why it was not applying an adverse BIA, but erroneously concludes that Commerce's failure to explain its reasons for not applying some other BIA renders the determination unsupported by substantial evidence on the record and contrary to law. Brief Of Plaintiff Gulf States Tube Div. Of Quanex Corp. In Support Of Its

the investigation. In other words, the ITA never "requested" this information from Dalmine. The ITA, in its discretion, determined that the ambiguous scope description excused Dalmine's failure to report this pipe and did not find that Dalmine

Motion For Judgment Upon The Agency Record at 43 (Quanex Brief).

With regard to the ASTM A–335 pipe used in boiler applications, Commerce stated:

we agree that the merchandise is within the scope of the investigation. However, we have decided that the use of adverse BIA for these unreported sales is unwarranted.... [T]he scope language, as published in the notice of initiation and the preliminary determination, was unclear as to whether the products in question are subject merchandise. The respondent did not report these sales based on its reading of the scope of the initiation. Since the scope language in the initiation is ambiguous (and hence has been clarified in the final determination), it is not appropriate to penalize the respondent.

Final Determination, 60 Fed.Reg. at 31,987.

Commerce did not apply any BIA to these sales, adverse or otherwise. As a result, the explanation set out above is the ITA's explanation for its treatment of these unreported sales, *i.e.,* their exclusion from the antidumping calculations. The ITA's explanation clearly states that the ambiguous scope description excused Dalmine's failure to report these sales. Application of any BIA may penalize Dalmine because it is the "Best Information Available" and not necessarily the most accurate information available. This would be contrary to the purpose of the antidumping laws which "are remedial not punitive." *NTN Bearing Corp. v. United States,* 74 F.3d 1204, 1208 (Fed.Cir.1995). Commerce has sufficiently explained its actions.

D

**The ITA's Decision To Apply Adverse BIA To Dalmine's Sale Of Honing Stock Is Supported By Substantial Evidence On The Record And Is In Accordance With Law**

Dalmine received permission from Commerce to not report its U.S. sales of meter

had "significantly impeded the investigation" on this issue. Because Commerce's determination not to apply BIA is affirmed by this Court, it follows that Commerce's determination not to apply adverse BIA is also affirmed.

run pipe and other products because they comprised less than 5% of Dalmine's total U.S. POI subject sales even though these products were covered by the scope of the investigation. Final Determination, 60 Fed. Reg. at 31,987; Mem. of Nov. 28, 1994 from Team to Stafford at 3. At verification, Commerce found an additional sale of a product called "honing stock" which it determined should have been included in the exclusion request. Because this additional sale raised the percentage of excluded products over 5% of Dalmine's total U.S. POI subject sales, Commerce decided to apply adverse BIA to the sale of honing stock and to the sales included in the exclusion request.

Dalmine argues that the honing stock was not covered by the scope of the investigation because it was a non-subject intermediate pipe that was produced to non-standard pipe sizes. Dalmine also argues that the application of adverse BIA to the sale of honing stock and to the excluded sales was "draconian". For the reasons that follow, the Court upholds Commerce's determination that the honing stock is reportable and that the application of adverse BIA to these sales is supported by substantial evidence on the record and in accordance with law.[5]

## 1

### Background

On September 19, 1994, Dalmine requested the exclusion of certain U.S. sales from its antidumping calculations, alleging that they constituted only an insignificant quantity of all U.S. sales. AR Non Pub. Doc. 7, Fiche 58, Fr. 41. Among other products, Dalmine requested the exclusion of meter run pipe.

In agreeing to exclude the U.S. sales from its margin analysis, Commerce warned:

We generally consider that outlier sales of less than 5% based on volume may be excluded from analysis. (*See, Stainless Steel Bar From Italy (A–475–813)*). We believe that in this case, the percentage of outlier sales is insignificant based on vol-

ume and do not consider such quantities critical to our analysis. **However, if the information is not available for verification in Italy, we will confirm the accuracy of the percentages and circumstances surrounding these sales at Dalmine's U.S. facilities.**

Mem. of Nov. 28, 1994 from Team to Stafford at 3, AR Non Pub. Doc. 22, Fiche 69, Fr. 90.

At verification, Commerce discovered that Dalmine failed to include an amount of meter run tubing in its request. Commerce considered both pipe and tube to be within the scope of the investigation because "the physical parameters of the scope include all seamless carbon and alloy steel pipes, of circular cross-section, not more than 4.5 inches in outside diameter, regardless of wall thickness. Therefore, the fact that such products may be referred to as tubes by some parties, and may be multiple-stenciled, does not render them outside the scope." Final Determination, 60 Fed.Reg. at 31,984.

As a result, Commerce applied an adverse BIA to the unreported pipe as well as the pipe included in the request. Commerce explained:

In the early stages of this investigation, the respondent made several requests to be excused from reporting particular categories of U.S. sales which were clearly covered by the scope of this investigation. The respondent based this exclusion request on the claim that these sales represented a certain percentage of total U.S. sales. Based on this representation, we granted the request but indicated that the claim would be subject to verification. At verification, we found additional unreported sales of the same merchandise that was the subject of the respondent's exclusion request. These additional unreported sales constitute a significant additional quantity than was represented in the exclusion request. Accordingly, we have assigned a margin based on BIA to the U.S. sales involved in the exclusion request, as

---

5. The Court, because it has affirmed Commerce's application of adverse BIA, does not need to reach Quanex's argument that Commerce's five percent exclusion policy "is beyond Commerce's statutory authority and would be contrary to law

if applied in this case." Mem. Of Gulf States Tube Div. In Oppos. To Dalmine's Mot. For Judgment On Counts I–VII at 38 ("Quanex Response").

well as the additional unreported sales of the same merchandise. *Id.* at 31,987.

## 2

### Honing Stock Is A Reportable Product Regardless Of Whether It Was A Non–Subject Intermediate Product And Was Produced To Non–Standard Pipe Sizes

Dalmine claims that the meter run pipe at issue, known as honing stock,[6] was not reportable because it was both a non-subject intermediate product and was produced to non-standard pipe sizes. Dalmine Case Brief at 9, 16, 29, 30, AR Non Pub. Doc. 93, Fiche 93–95, Fr. 1. However, because the A–106 stencil appeared on the honing stock and it was not used in an excluded application, it is reportable. In addition, the Court rejects Dalmine's argument that the honing stock, as a "tube", is not covered by the scope of the investigation.

### a

### The Honing Stock Bore An A–106 Stencil And Was Not Used In An Excluded Application

■ The ITA excluded from the investigation "redraw hollows", stating:

> With respect to redraw hollows for cold drawing, the scope language excludes such products specifically when used in the production of cold-drawn pipe or tube. We understand that petitioner included this exclusion language expressly and intentionally to ensure that hollows imported into the United States are sold as intermediate products, not as merchandise to be used in a covered application.

Final Determination, 60 Fed.Reg. at 31,984.

Dalmine argues that honing stock is an intermediate product that is finished through a cold process (that is, honing), just like hollows. In addition, Dalmine states that honing stock is not used to convey liquids or gas (or in any other application) and there-

fore is not used "in a covered application", in the form in which it is sold by Dalmine. Dalmine argues that it reasonably concluded that it was not subject merchandise because honing stock must undergo significant further processing before it can be used. *See* Sales Verif. Ex. M–6, AR Non Pub. Doc. 87, Fiche 89, Fr. 51 (showing that the merchandise was processed by a customer of Dalmine's).

Commerce made no determination that honing is equivalent to cold-drawing, and the scope description does not indicate that honing is excluded from the investigation as equivalent to cold-drawing. *See* Initiation Notice, 59 Fed.Reg. at 37,026. Further processing of the honing stock by the purchaser does not meet the "redraw hollows" exclusion from the scope of the investigation. *See id.* (Commerce's guidance on this exclusion is: "[e]xcluded from these investigations are redraw hollows for cold-drawing when used in the production of cold-drawn pipe or tube.").

The record shows that the A–106 stencil appeared on honing stock in question. *See* Sales Verification Exhibit M–6, AR Non Pub. Doc. 87, Fiche 89, Fr. 51. That is one of the four listed specifications contained in the scope description. Accordingly, the honing stock was within the scope of the investigation. *See* Initiation Notice, 59 Fed.Reg. at 37,025–26. Coupled with the evidence that it was not used in an excluded application, honing stock was a reportable product. As a result, Commerce's determination that the honing stock is covered by the scope of the investigation is reasonable and in accordance with law.

### b

### Even If The Honing Stock Is Considered A "Tube", It Is Still Covered By The Scope Of The Investigation

■ Dalmine also argues that the honing stock was not subject merchandise because it is a "tube" produced to non-pipe sizes, and is not a "pipe". Dalmine states that pipes are

---

6. Honing stock is a type of meter run pipe that is used in flow measurement applications in which the customer's inside diameter requirements are more precise than can be achieved by the more conventional cold-drawing process. Brief Of Dal-

mine S.p.A., Dalmine USA Inc., And TAD USA, Inc. In Support Of Their Motion For Judgement Upon The Agency Record at 30–31 (Dalmine Brief).

hollow steel products produced to a finite number of OD and wall thickness combinations such as ASTM A–106, A–53, A–335, and API–5L. Tubes, it claims, are produced to any other OD or wall thickness combinations. Dalmine Brief at 34–36. Dalmine points to Commerce's statement that redraw hollows could be used to produce either "pipe or tube" as a further example that Commerce recognized a difference. *See* Initiation Notice, 59 Fed.Reg. at 37,026.

The ITA determined that all hollow steel products, both pipes and tubes, having an OD of not more than 4.5 inches, were products subject to the Seamless Pipe investigation. Final Determination, 60 Fed.Reg. at 31,984. The ITA pointed out that the product definition included in the investigation all pipe having an OD of less than 4.5 inches, "regardless of wall thickness." *Id.* Commerce stated:

> Although it is unclear as to where the dividing line between pipe and tube products is at the present time, it is our understanding that petitioner intended to include pipes of all wall thicknesses in the scope of the subject proceedings. The very first sentence of the scope which refers to the physical description of the merchandise reads as follows: "For purposes of [these investigations], seamless pipes are seamless carbon and alloy (other than stainless) steel pipes, of circular cross-section, not more than 114.35 mm (4.5 inches) in outside diameter, *regardless of wall thickness* (emphasis added) ..." Although not specifically stated in the petition, it would appear by this language that tubes are included in the scope of the investigation if they are produced to one of the covered specifications or otherwise used in standard, line or pressure pipe applications.

Mem. Re. Additional Scope Clarification Questions at 7, AR Pub. Doc. 258, Fiche 52; Fr. 60. Thus, Commerce's determination that there is no distinction between pipes and tubes in this case is reasonable.[7]

7. The Court rejects Dalmine's argument that "[t]his phrase [regardless of wall thickness] does *not* mean that the product scope includes all hollow steel products of *every* wall thickness."

3

### The Application Of Adverse BIA Due To The Unreported Honing Stock Sale Is Supported By Substantial Evidence On The Record And In Accordance With Law

■ When Commerce discovered the honing stock that should have been included in the exclusion request, it applied adverse BIA to that sale as well as to those sales included in the exclusion request. Dalmine argues that this action is "draconian" and exaggerates the significance of the honing stock sale. The Court affirms Commerce's application of adverse BIA to these sales.

Congress has provided for Commerce to use the "Best Information Available" whenever it is unable to verify the accuracy of information provided in a response, information requested is not supplied in a timely manner or the required form due to either refusal or inability, or the investigation is significantly impeded. 19 U.S.C. § 1677e(b) and (c). According to the tiered system for using BIA, BIA can be partial or total, and can be adverse or non-adverse, depending on the circumstances. *Nat'l Steel Corp. v. United States*, 18 CIT 1126, 1131, 870 F.Supp. 1130, 1135 (1994). Commerce will apply non-adverse partial BIA where there is an inadvertent gap in the record or a minor or insignificant adjustment is involved. *Id.* at 1132, 870 F.Supp. at 1136.

The Court of Appeals for the Federal Circuit has determined the conditions under which BIA may be considered adverse or "punitive". It stated:

> In order for the agency's application of the best information rule to be properly characterized as "punitive," the agency would have had to reject low margin information in favor of high margin information that was demonstrably less probative of current conditions.

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed.Cir.1990).

Dalmine Brief at 37–38 (emphasis in original). It appears from the record that is exactly what Commerce meant, if they contain the subject stencils.

Dalmine argues that it made a *single* sale of only [ ] tons of honing stock in the U.S. market during the POI, equal to [a certain percentage] of their total POI U.S. sales of subject merchandise. Dalmine concludes that "[t]his trivial amount cannot be 'significant' under any circumstances." Dalmine Brief at 38. Dalmine adds that even if it had included the honing stock sale in its exclusion request, the total of the request would still be less than 5% of U.S. subject total sales and thus is harmless error. Dalmine Brief at 39.

Commerce granted Dalmine's exclusion request based on the representations made by Dalmine. Contrary to Dalmine's assertion, inclusion of the honing stock in the exclusion request would have caused it to be over 5% of the total U.S. sales. The honing stock sale of [ ] tons added to the [ ] tons Dalmine requested the exclusion for, amounts to over 5% of the total U.S. sales of [ ] tons that should have been reported by Dalmine for the POI ([ ] actually reported by Dalmine plus [ ] which should have been reported). Defendants' Mem. In Partial Opposition To Counts 1–7 Of The Mot. For Judgment On The Agency Record Filed By Dalmine at 26–27 ("Defendants' Mem."). Thus, the exclusion request fell outside Commerce's stated guidelines.

Accordingly, the addition of the single sale of honing stock is significant because it raised Dalmine's unreported sales above the 5% threshold. *See* Final Determination 60 Fed.Reg. at 31,987. The missing information, *i.e.*, the honing stock sale, was in the control of Dalmine. This information did not amount to an inadvertent gap in the record and cannot be considered a minor or insignificant adjustment which would justify the application of neutral BIA. Thus, application of adverse BIA is appropriate and hardly "draconian".[8]

8. Draconian: barbarously severe; harsh; cruel. *Webster's New International Dictionary*, Unabridged, 780 (2d ed.1954). The ITA's actions in this instance do not rise close to the level of "draconian". Indeed, the ITA's treatment of these sales is consistent with its treatment of the ASTM A–335 pipes used in boiler applications

**E**

**The ITA's Decision To Initiate A Below–Cost–Of–Production ("COP") Investigation Of Dalmine's Home Market Sales Is Supported By Substantial Evidence On The Record And In Accordance With Law**

Commerce initiated a COP investigation of Dalmine's home market sales based on information given to it by Quanex. Subsequently, Commerce did find below cost-of-production sales and as a result employed the constructed value of the merchandise to determine the foreign market value. Dalmine claims that ITA's initiation of the COP investigation was unlawful because (1) it lacked reasonable grounds to believe or suspect that Dalmine's home market prices were below its cost of production and (2) Quanex failed to provide an appropriate public version of its allegations, contrary to Commerce's regulations. For the reasons that follow, Dalmine's arguments fail.

**1**

**Background**

In a letter dated November 22, 1994, Quanex alleged that Dalmine was selling seamless pipe in Italy at below cost. AR Non Pub. Doc. 21, Fiche 69, Fr. 1. Quanex claimed that it "does not know, and has no way of obtaining Dalmine's actual cost of production for the subject merchandise" because Dalmine had not (1) reported its sales in the U.S. that did not have identical matches in Italy or any differences in the physical characteristics of the merchandise being compared, and (2) placed on the record detailed financial statements. *Id.* at 1–2. As a result, Quanex stated that it had to construct Dalmine's COP using the COP of a U.S. domestic producer that had similar production processes and cost structure to Dalmine. *Id.* at 2.

discussed previously and from which Dalmine benefited when the ITA decided to exclude those sales from the margin calculation. Dalmine is asking the Court to require ITA to treat these products differently, which the Court declines to do.

Dalmine objected to the information presented by Quanex. Dalmine's Letter of Dec. 2, 1994, AR Pub. Doc. 97, Fiche 17, Fr. 23. Dalmine claimed that the cost analysis was flawed because (1) the surrogate's cost should have been based on the fiscal year of 1994 instead of 1993; and (2) the International Trade Commission ("ITC") had found that the productivity of the U.S. domestic industry has been increasing since 1992, contrary to Quanex's representation that it had decreased. *Id.*

Quanex responded to Dalmine's first comment by explaining that the 1994 and 1993 usage rates had been certified as identical by the party supplying the information. Quanex's Letter of Dec. 9, 1994 at 1–2, AR Non Pub. Doc. 25, Fiche 70, Fr. 25. With regard to the second comment, Quanex stated that the "aggregated data reported by the ITC simply has no relationship to the producer-specific and product-specific data used by petitioner." *Id.* at 2.

Initially, Commerce decided not to initiate the COP investigation because it could not rely upon the cost data submitted by Quanex to show whether there were reasonable grounds to believe or suspect that below-cost sales were made. Mem. of Dec. 23, 1994 from Team to Stafford, AR Non Pub. Doc. 33, Fiche 79, Fr. 28. Quanex objected to the decision not to initiate a COP investigation. Quanex's Letter of Jan. 3, 1995, AR Non Pub. Doc. 34, Fiche 79, Fr. 32.

Commerce's Office of Accounting and Investigations consulted with Richard Weible, the Division Director of the Office of Agreements Compliance, and the in-house expert on matters relating to the steel industry. Mr. Weible analyzed Quanex's below-cost allegations and concluded that the methodology used by Quanex was reasonable. Mem. of Feb. 1, 1995 from Mr. Weible, AR Non Pub. Doc. 54, Fiche 81, Fr. 41.

Taking into account the information submitted by Quanex and Dalmine, Mr. Weible made several determinations. He agreed with Dalmine that seamless pipe mills produce products in specific size ranges, that producing pipe in smaller sizes will cost more, and that companies invariably have different production facilities which produce unique products with individual size range capabilities. *Id.* Mr. Weible recognized, however, that the size ranges may overlap from mill to mill. He stated that petitioners would be unable to make COP allegations if they were required to provide cost data for a comparable mill with the same product size range capacity. *Id.*

Mr. Weible concluded that Quanex provided reasonably available evidence for determining whether Dalmine's sales were below-cost in a certain size. He based this conclusion on the fact that Quanex used the costs of 2 inch material from a surrogate that used the same process as Dalmine to produce the product in its allegations. In addition, the size range capabilities of the surrogate and Dalmine overlapped in this size. *Id.* Finally, the method used by Quanex when it calculated cost differentials, taking into account possible cost differences in producing pipe by different processes (rotary piercing versus the extrusion process), and then deriving costs in smaller sizes by using these differentials was reasonable if not somewhat conservative. *Id.*

In reconsidering its decision not to initiate a COP investigation, Commerce relied upon the following factors: (1) the similar production processes used by the surrogate and Dalmine despite the different size ranges; (2) the application of Quanex's cost ratios to costs developed from the surrogate's data, which provided a conservative result even though the ratios did not exactly reflect Dalmine's cost relationship; and (3) the rejection of Quanex's allegation because it was unable to obtain data from a mill with exactly the same product size range and production facilities would be unreasonable and inconsistent with Commerce's standard for initiation of COP investigations. Mem. of Feb. 1, 1995 from Team to Stafford at 6, AR Non Pub. Doc. 53, Fiche 81, Fr. 33. Subsequently, Commerce found below COP sales for certain products. 60 Fed.Reg. at 31,986.

2

**The Record Contains Substantial Evidence That Commerce Had Reasonable Grounds To Believe or Suspect below Cost–Of–Production Sales**

An antidumping duty is calculated "in an amount equal to the amount by which the

foreign market value exceeds the United States price for the merchandise." 19 U.S.C. § 1673. Usually, foreign market value is based upon the price at which the merchandise is sold in the market of the exporting country for home consumption or to third countries other than the United States. 19 U.S.C. § 1677b(a)(1). However, the statute provides:

> Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market of the country of exportation ... have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. . . .

19 U.S.C. § 1677b(b). If below costs sales were made in substantial quantities and over an extended period of time, they must be disregarded. *Id.* Commerce must then employ the constructed value ("CV") of the merchandise if the remaining above-cost sales are inadequate for determining foreign market value. *Id.*

"Commerce must have a 'specific and objective' basis for suspecting or believing that sales are being made at prices below the COP before initiating a COP investigation." *FMC Corp. v. United States,* 3 F.3d 424, 428 (Fed.Cir.1993) (citing *Al Tech Specialty Steel Corp. v. United States,* 6 CIT 245, 250, 575 F.Supp. 1277, 1282 (1983), *aff'd on other grounds,* 745 F.2d 632 (Fed.Cir.1984)). However, as the Federal Circuit stated in *FMC:*

> [Petitioner] is not required under the statute to prove actual sales below the COP. That is a job for Commerce. To require otherwise would go against the grain of common sense because if [Petitioner] can prove actual sales at below [Respondent's] COP, then a COP investigation would not be necessary.

3 F.3d at 428 n. 7. In addition, this Court has stated:

> There is no correlation between what constitutes reasonable grounds to the ITA, and what constitutes information reasonably available to the petitioner. Indeed, the information which is reasonably available to a particular petitioner can be substantially more or less consequential than what Commerce would consider reasonable grounds, depending on how resourceful the petitioner may be. **Hence, the relative rigor of the standard will vary from case to case.**

*Torrington Co. v. United States,* 15 CIT 456, 460–61, 772 F.Supp. 1284, 1288 (1991) (emphasis added). Here, as recapped in the "Background" of this section, the record shows Commerce had reasonable grounds to suspect that Dalmine was selling below cost. These reasonable grounds are sufficient to explain why Commerce reversed its decision not to perform a COP investigation.[9]

The Court also rejects Dalmine's assertions that Quanex's cost allegations were based on impermissibly non-contemporaneous information, and that the Surrogate's claim its 1993 and 1994 actual "usage rates" were identical is inherently implausible. Dalmine Brief at 47–50. The record reflects that Quanex did use contemporaneous information, *i.e.,* from 1994, which was identical to the 1993 information, because it provided an Affidavit from an official of the surrogate which states that "the usage rates for the surrogate did not change between 1993 and 1994." Quanex Letter of Jan. 3, 1995. Dalmine's claim that identical rates are "inherently implausible" is speculative and unsupported by any competent evidence in the record.

■ Dalmine also argues that the ITA unlawfully ignored its own practice requiring below cost allegations to be based on costs

---

9. The Court need not reach Quanex's argument that this issue is moot because actual below-cost sales were found. Quanex Response at 55. Further, at oral argument held on February 26, 1997, counsel for Quanex admitted that if this issue were remanded it would not be entitled to submit information obtained during the below-cost sales investigation. Quanex misread *Koyo*

*Seiko Co. v. United States,* 16 CIT 740, 796 F.Supp. 517 (1992), which permitted the petitioner only to "supplement its allegation of below-cost-of-production sales with information not derived from [ITA's] investigation of below-cost-of-production sales." *Id.* at 745, 796 F.Supp. at 531 (emphasis added).

incurred by U.S. producers adjusted to reflect production costs in the country under investigation. Specifically, Dalmine claims that (a) Commerce made no effort to determine whether the Surrogate uses the same type of "continuous mill" that Dalmine uses, and (b) the Surrogate's per unit usage rates are biased against Dalmine because, it says, the Surrogate probably uses heavier, more expensive equipment to product its seamless pipe, given that its size range is likely larger than Dalmine's range of small diameter pipe.

Dalmine did not cite any statutory authority for its claim that Commerce's regulations require COP allegations to be "adjusted for known differences" in manufacturing processes. Nor did Dalmine demonstrate that it is Commerce's practice to require such adjustments. Nevertheless, the record contains substantial evidence that Commerce did consider these issues raised by Dalmine. *See* Mem. of Feb. 1, 1995 from Team to Stafford. The record states:

> we note that the surrogate and respondent use similar production processes, even though the size range of seamless pipe produced may not be the same. When petitioner's cost ratios are applied to cost developed from the surrogate's data, even if these ratios do not exactly reflect respondent's cost relationships, the result is conservative and, therefore, in respondent's favor. This is because petitioner's methodology yielded a lower cost per ton for the smaller diameter pipe, which generally is more expensive on a tonnage basis, than larger diameter pipe.

*Id.* at 6. Thus, since Commerce's decision is supported by substantial evidence on the record and is in accordance with law, Dalmine's argument is rejected.

■ Finally, the Court rejects Dalmine's argument that the "exclusionary rule" from the Fourth Amendment is applicable to the initiation of a below-cost investigation. The exclusionary rule is applied in criminal cases or "quasi-criminal" cases to deter unreasonable searches and seizures. *United States v. Modes, Inc.,* 16 CIT 189, 192–94, 787 F.Supp. 1466, 1470–71 (1992). A quasi criminal case is one in which "the objective of those proceedings is to impose what appears to be a penalty." *Id.* at 193, 787 F.Supp. at 1471. Thus, in civil proceedings, the exclusionary rule is applicable only "where the 'object, like a criminal proceeding, is to penalize for the commission of an offense against the law.' " *Id.* at 191, 787 F.Supp. at 1469 (quoting *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170 (1965)).

This proceeding is not criminal or quasi-criminal in nature. The objective of the antidumping statute is not to penalize a respondent. *See NTN Bearing Corp. v. United States,* 74 F.3d 1204, 1208 (Fed.Cir.1995) (recognizing that the antidumping laws are remedial rather than punitive). Rather, the purpose of the proceeding is to assess duties that will in principle eliminate the unfair trade practice. *See Chaparral Steel Co. v. United States,* 8 Fed. Cir. (T) 101, 109, 901 F.2d 1097, 1103 (1990) (purpose of duties is remedial because they are "intended merely to prevent future harm to the domestic industry by reason of unfair imports that are *presently* causing material injuries." (emphasis in original)). Consequently, the exclusionary rule is inapplicable in this case.

**3**

**The Initial Failure Of Quanex To Provide An Appropriate Public Version Of The Business Proprietary Allegations To The Below–Cost–Of–Product Petition Did Not Render ITA's Initiation Of The Below COP Investigation Improper**

■ The statute requires that when a document containing proprietary information is submitted to ITA, it:

> *shall* require that information for which proprietary treatment is requested be accompanied by—
>
> (A) either—
>
> > (i) a non-proprietary summary in sufficient detail to permit a reasonable understanding of the substance of the information submitted in confidence, or
> >
> > (ii) a statement that the information is not susceptible to summary accompanied by a statement of the reasons in support of the contention. . . .

19 U.S.C. § 1677f(b)(1) (emphasis added). The ITA's regulations on antidumping duties state:

> *Public Summary* ... [N]ot later than one business day after submitting information for which proprietary treatment is requested, any person who requests proprietary treatment *shall* provide to the Secretary: (1) An adequate public summary of all proprietary information, incorporated in the public version of the document (generally, *numeric data are adequately summarized if grouped or presented in terms of indices, or figures within 10 percent of the actual figure, and if an individual portion of the data is voluminous, at least one percent representative of that portion is individually summarized in this manner*); or
> (2) A statement itemizing those portions of the proprietary information which cannot be summarized adequately and all arguments supporting that conclusion for each portion.

19 C.F.R. § 353.32(b) (1994) (emphasis added).

There is no allegation or evidence in the record indicating Quanex's submission of below-cost allegations containing proprietary information was untimely. The issue concerns only the submission of the public version. The record reflects that Quanex did submit the necessary public summary. On January 17, 1995, Commerce orally requested Quanex to submit a revised nonconfidential version of its November 22, 1994 allegation of sales below cost. *See* Quanex's Letter of Jan. 17, 1995, AR Pub. Doc. 132, Fiche 26, Fr. 27. Quanex complied, and Commerce properly considered the information.

The Court rejects Dalmine's argument that it was unable to gain a "reasonable understanding of the substance" necessary to adequately participate in defending their interests against Quanex's below-cost allegations because a proper non-confidential summary was unavailable. Dalmine Brief at 65. Dalmine's counsel had access to the proprietary document under an administrative protective order. *See* 19 U.S.C. § 1677f(c). Although Dalmine claims that "[c]ounsel's access to the business proprietary data under an APO is *no* substitute for the client's access to the public version of those data", Dalmine's Reply to Mem. In Opp. To Dalmine Brief at 15 ("Dalmine Reply"), the Court notes that Dalmine's counsel was able to obtain sufficient cooperation from its client to craft its legal arguments in considerable depth.

■ Dalmine's claim that the public version was insufficient under 19 C.F.R. § 353.32(b) is rejected. Commerce's regulations provide that "generally, numeric data are adequately summarized if grouped or presented in terms of indices, or figures within 10 percent of the actual figure...." 19 C.F.R. § 353.32(b)(1). The public version contained (1) indexed costs for each subcategory of cost in Exhibit 1 and (2) provided indexed costs for each stage of production and indexed usage rate and ranged cost subtotals for each stage of production in the cost build-up in Exhibit 2. Quanex's Letter of Jan. 17, 1995. Quanex did not include a public summary of the results of the below-cost analysis because it contained Dalmine's proprietary data which Quanex was not allowed to summarize. *Id.* Thus, there is substantial evidence on the record to support Commerce's initiation of the COP investigation.

## F

### The Court Remands To ITA To Recalculate The COP And CV With Respect To DTI's Galvanized Products

■ Commerce overstated Dalmine's actual COP for galvanized pipe produced by Dalmine Tubi Industriali S.r.l. (hereinafter "DTI"), a production subsidiary of Defendant–Intervenor Dalmine S.p.A., by improperly allocating factory overhead costs. Consequently, the Court remands for recalculation of the COP and CV with respect to DTI's galvanized products.

DTI produces Seamless Pipe at a facility known as the "FAP mill." Cost Verif. Rep. at 2, AR Non Pub. Doc. 91, Fiche 92, Fr. 1. For certain galvanized pipes that Dalmine sold in the U.S. market, DTI produced the bare (ungalvanized) pipe at the FAP mill, and then used an unrelated third party to

transport the bare pipe to a second unrelated third party for galvanizing. Response of Dalmine to the Dept's Section D Quest. at 44–45 (Dec. 19, 1994), AR Non Pub. Doc. 29, Fiche 71–78. As a result, the galvanizing and transportation costs are incurred outside Dalmine's production facility.

In the Final Determination, ITA made certain adjustments to Dalmine's previously reported factory overhead costs. 60 Fed.Reg. at 31,986. Commerce agrees, and the record reflects, that these adjustments resulted in the overstatement of the factory overhead costs attributable to galvanized pipe. An error occurred when Commerce applied revised cost variance and overhead rates. At that time, Commerce calculated the overall variance rate as the total variance to total standard cost. When the variance rate was applied to the cost of manufacturing which included galvanizing costs, the COP and CV were overstated. Defendants' Mem. at 45–46. Although a request by Commerce for remand does not control the Court, *see Hylsa, S.A. de C.V. v. United States,* 960 F.Supp. 320, 322 (CIT 1997), in this case there is substantial evidence on the record that an error in calculation occurred. Consequently, this issue is remanded to Commerce.

## G

**The ITA's Decision To Attribute A Portion Of IRI's Interest Expenses To Dalmine's COP And CV Is Supported By Substantial Evidence On The Record And Is In Accordance With Law**

Commerce attributed a portion of the consolidated interest expense reported by Dalmine's parent company, IRI S.p.A.,[10] to Dalmine's COP and CV. Dalmine claims that this action distorted its actual interest expenses. For the reasons that follow, the Court rejects Dalmine's argument.

### 1

### Background

Commerce used the interest expense of IRI for calculating Dalmine's CV and COP

instead of Dalmine's own financing costs. Because IRI's 1994 audited consolidated financial statements were not available, Commerce used IRI's 1993 statements. Mem. from Theresa L. Caherty, Accountant to Christian Marsh, Director, Office of Accounting, Verification of COP and CV at 26 (May 10, 1995), AR Non Pub. Doc. 91, Fiche 92, Fr. 1. In the Final Determination, Commerce explained its actions:

> The Department's long-standing practice is to calculate interest expense for COP/CV purposes from the borrowing costs incurred by the consolidated group. Silicon Metal from Brazil, 56 Fed.Reg. at 26,986 (1991). This methodology, which has been upheld by the CIT in Camargo Correo Metals, S.A. v. U.S., Slip Op. 93–163 (CIT 1993), is based on the fact that the consolidated group's controlling entity has the power to determine the capital structure of each member of the group. IRI has such power since it owns a substantial majority of Dalmine through ILVA. In addition, although the respondent claims that IRI does not exercise control over Dalmine's operations, it is the Department's position that majority equity ownership is prima facie evidence of corporate control. See, e.g., Final Determination of Sales at Less Than Fair Value: New Minivans from Japan (Minivans), 57 FR 21946 (May 26, 1992). The respondent has not presented sufficient evidence to demonstrate that IRI's consolidated financing expense would distort Dalmine's financing costs. In Minivans, we determined that, as a member of a consolidated group of companies, the operations of a financing company remain under the controlling influence of the group. Like other members of the consolidated group, the financing company's capital structure is determined largely within the group. Consequently, its interest income and expense are as much as part of the group's overall borrowing experience as any other member company.

---

**10.** The relationship between the companies is: Dalmine is DTI's first line parent. 84.08% of the outstanding stock of Dalmine is owned by ILVA S.p.A. in liq. ("ILVA"). The majority of Dalmine's financing is provided by Ilva Finance Limited ("ILIIC") another subsidiary of ILVA. ILVA is in turn owned 100% by Instituto per La Riconstruzione Industriale S.p.A. ("IRI").

Mem. of May 10, 1995 at 26.

Lastly, we do not consider it more appropriate to use Dalmine's 1994 consolidated figures over IRI's 1993 consolidated figures simply because Dalmine's audited information more closely relates to the time period of the POI. We have no reason to believe that IRI's 1993 audited financial statement interest expense data is not representative of the POI.

Final Determination, 60 Fed.Reg. at 31,990.

## 2

### Commerce's Calculation Of Dalmine's Interest Expense For COP And CV Purposes From The Borrowing Costs Incurred By The Consolidated Group Is Reasonable

When calculating CV, Commerce adds "an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration ...", 19 U.S.C. § 1677b(e)(1)(B), to the cost of materials and of fabrication or other processing. According to Commerce's regulations, COP is based on the cost of materials, fabrication and general expenses incurred in the production of such or similar merchandise. 19 C.F.R. § 353.51(c).

Congress has not clarified what "general expenses" are or how they are calculated. See 19 U.S.C. § 1677b(e)(1)(B). Pursuant to the discretion granted to it by Congress, then, Commerce devised a methodology for calculating general expenses. Commerce includes in general expenses both (1) selling, general and administrative expenses, and (2) financial expenses. See, e.g., Verification of COP and CV Mem. of May 10, 1995 from Caherty to Marsh, Director, Office of Accounting, at 24–27, AR Non Pub. Doc. 91, Fiche 92, Fr. 1 (setting forth the basic steps Commerce performed during verification of Dalmine's general expenses).

IRI is Dalmine's ultimate parent. As a result, Commerce attributed a portion of the consolidated interest expense reported by IRI on its consolidated financial statements to Dalmine's reported COP and CV, and thus calculated Dalmine's interest expense from the borrowing costs incurred by the consolidated group as a whole. Final Determination, 60 Fed.Reg. at 31,990.

Dalmine does not disagree that Commerce may use the consolidated interest expense from a parent company when the subsidiary is being investigated. Rather, Dalmine claims that in this case, Commerce should have used Dalmine's own financing costs instead of those of IRI. Although Dalmine was able to cite to other cases in which the ITA treated consolidated interest expenses differently from this case, those decisions were presumably supported by substantial evidence on the administrative record which justified a change in Commerce's practice. As discussed in more detail below, Dalmine was not able to provide support for its contentions through cites to the record. Thus, the Court finds Commerce's practice to be reasonable.

### a

### The Record Does Not Contain Substantial Evidence that IRI Does Not Exercise Control Over Dalmine's Operations

■ Commerce's practice is to consider majority equity ownership to be *prima facie* evidence of parent control over a subsidy. As a result, Dalmine had the burden of submitting evidence to Commerce rebutting this presumption. Dalmine failed to meet that burden.

The Court rejects Dalmine's assertion that while IRI legally controls a majority of Dalmine's shares, it exercises no effective production, marketing, or managerial control over Dalmine's operations. Dalmine Brief at 72. Although Dalmine claims that Dalmine S.p.A. operates as an independent, profit-maximizing corporation, without the financial assistance of IRI or any IRI–affiliated party, *id.*, the record does not contain substantial evidence to that effect.

In support of Dalmine's argument that it is independent, Dalmines cites to the verification report issued by ITC in the companion countervailing duty investigation of the subject merchandise. See Mem. from McGinty and Wilkniss to Kuhbach at 5, Annex K to Dalmine's Case Brief. The report states that "[w]e asked IRI officials how much discretion IRI exercises when presented with a

subsidiary's business plan. Officials explained that IRI may make suggestions and may assist in and follow the activities of the subsidiary, but its involvement is limited to an advisory role." *Id.*

Dalmine's citation to the verification report issued by the ITC in the companion countervailing duty investigation does not rectify the failure of Dalmine to provide evidence during the administrative proceeding in the antidumping investigation that IRI had no such control over Dalmine's capital structure, production, selling, or management decisions. Dalmine failed to provide Commerce with substantial evidence on the record to necessitate a change in practice in this case. Further, because countervailing duty laws are directed at a different type of unfair trade practice than antidumping duty laws, an antidumping proceeding is not bound by findings in a countervailing duty proceeding. *See Aimcor, Alabama Silicon, Inc. v. United States,* 18 CIT 1117, 1123, 871 F.Supp. 447, 453 (1994).

**b**

**The Record Does Not Contain Substantial Evidence In Support Of Dalmine's Assertion That IRI Does Not Have The Power To Determine Dalmine's Capital Structure**

■ The Court rejects Dalmine's argument that because IRI allegedly did not have the capability of changing Dalmine's capital structure at will, Commerce acted unlawfully in resorting to IRI financial data. Dalmine Brief at 74–75. The ITA has a "well-established practice of deriving net financing costs based on the borrowing experience of the consolidated group of companies.... [The ITA's] practice is based on the fact that the group's parent, primary operating company, or other controlling entity, because of its influential ownership interest, has the power to determine the capital structure of each member company within the group." Minivans, 57 Fed.Reg. at 21,946. Dalmine has interpreted this statement to mean that the majority equity owner must be able to change the capital structure of subsidiaries at will.

Dalmine's argument is flawed because Commerce does not require the parent company to be able to change the capital structure "at will". Rather, Commerce's policy is based on the rebuttable presumption that "majority equity ownership is prima facie evidence of corporate control." *Minivans,* 57 Fed.Reg. at 21,946.

Dalmine also argues that the ITA has focused on only the legal relationship between IRI and Dalmine even though there is an absence of any distortive financial transactions between them. Dalmine Reply at 46. This, according to Dalmine, is contrary to this Court's decision in *FAG Kugelfischer v. United States,* 932 F.Supp. 315 (CIT 1996). In *FAG Kugelfischer,* the Court found that the administrative record did not support ITA's decision to collapse the sales of two sister companies for purposes of calculating dumping margins. The Court observed that ITA:

focused on "potential" rather than "actual" influence that [the sister companies' parent] may assert over its subsidiaries. This potential for influence absent consideration of other factors is not enough to create a strong possibility of price manipulation.

*Id.* at 324.

*FAG Kugelfischer* is inapposite here. In *FAG Kugelfischer,* Commerce collapsed the companies for purposes of calculating dumping margins because of its concern that "granting two related companies separate treatment creates an incentive to evade the dumping order by making U.S. sales through whichever company has a lower margin." *Id.* at 322. Those concerns are not at issue in this case. Here, Commerce is not dealing with sister companies. Instead, it is looking at the parent-subsidiary relationship. It is simply following its practice of considering Dalmine's ownership by IRI to be *prima facie* evidence of IRI's control. Dalmine failed to rebut Commerce's presumption that there is "actual" influence in this situation. Thus, Commerce's actions are affirmed.

**3**

**The Record Does Not Contain Substantial Evidence That By Using IRI's Consolidated Interest Expense, Commerce Is Distorting Dalmine's True Financing Expenses**

■ The Court rejects Dalmine's argument that by using IRI's consolidated inter-

est expense, ITA is distorting Dalmine's true financing expenses. Dalmine Brief at 76. For the reasons discussed below, Commerce's decision is supported by substantial evidence on the record and is in accordance with law.

Commerce normally uses a parent company's consolidated financial statements even in cases involving consolidated groups whose member companies are involved in a wide variety of business activities. *Minivans,* 57 Fed.Reg. at 21,946. Thus, it is irrelevant that "IRI is a huge government-owned holding company, with equity interests in diverse operations." Dalmine's Case Brief at 56.

In addition, Commerce will allow respondents to "present[ ] evidence sufficient to show that the Department's practice of calculating interest expense based on the consolidated group of companies would result in any distortion of the true financing costs of [the subsidiaries'] operations." Minivans, 57 Fed. Reg. at 21,946. Thus, Commerce will change its practice of using a parent company's consolidated financial statement regardless of the activities of its member companies when presented with the appropriate information. Nothing in the record of this case indicates Dalmine gave Commerce any evidence that would have justified different treatment. The ITA's actions, then, are supported by substantial evidence on the record and in accordance with law.

### a

### The ITA's Decision That Dalmine's Own Consolidated Interest Expense Does Not Reflect The Full Financing Cost For The Subject Merchandise Is Reasonable

■ Dalmine argues that it is reasonable to conclude the consolidated interest expense reported in its financial statements is the full financing cost for the pipe in issue. The role of the Court, however, is to determine not the reasonableness of a party's position, but that of Commerce's method in reaching its position. *See Chevron, supra.* Here, Commerce's method is reasonable.

In conducting a COP/CV investigation, the ITA's goal is to calculate the full actual cost to produce the subject merchandise. *See* 19

U.S.C. § 1677b(b). Commerce based its calculations on the IRI consolidated expense. Although it might also be reasonable for Commerce to have based its calculations on Dalmine S.p.A.'s consolidated statements, the Court may only determine whether Commerce's method was a reasonable one. In view of the presumption that majority equity ownership of a subsidiary as *prima facie* evidence of corporate control, Commerce's use of IRI's consolidated expense is reasonable.

### b

### Commerce's Decision To Use The 1993 IRI Consolidated Interest Expense Is Supported By Substantial Evidence On The Record And In Accordance With Law

■ The Court rejects Dalmine's argument that Commerce should have used its 1994 audited consolidated interest expense because that is allegedly more probative information for production and sales during the POI than 1993 IRI consolidated interest. Dalmine Brief at 82. Unless contrary evidence is provided, the prior year is assumed to be reasonably representative of the company's normal experience. *See Furfuryl Alcohol from Thailand,* 60 Fed.Reg. 22,557, 22,561 (May 8, 1995). Commerce will use the prior-year consolidated financials when more current financials are unavailable so long as they reasonably reflect the current financial situation. *Certain Hot–Rolled Carbon Steel Flat Products,* 58 Fed.Reg. 37,125, 37,135 (July 9, 1993).

The POI was the first six months of 1994. Final Determination, 60 Fed.Reg. at 31,985. IRI's consolidated financial statements were not available at the date of verification, although Dalmine's 1994 consolidated financials, including the consolidated interest expense recorded therein, were available. Dalmine's Cost Verification Exh. A–12, AR Non Pub. Doc. 87, Fiche 89, Fr. 51. Commerce used IRI's audited consolidated financial statements from 1993 in accordance with its policy discussed above. Thus, Commerce's action is supported by substantial evidence on the record and in accordance with law.

## H

### The ITA's Decision To Reduce IRI's Interest Expenses By Short–Term Interest Income Only Is Supported By Substantial Evidence On The Record And In Accordance With Law

In calculating COP and CV, Commerce used a portion of IRI's financing expenses. *See* Final Determination, 60 Fed.Reg. at 31,-990–91. Dalmine claims that IRI's financing costs should be offset with both short-term and long-term interest income. As discussed below, Commerce's action is supported by substantial evidence on the record and is in accordance with law.

### 1

### Background

In the Final Determination, Commerce stated:

It is the Department's practice to allow a respondent to offset financial expenses with interest income earned from the general operations of the company. See, e.g., *Timken v. United States*, 852 F.Supp. 1040, 1048 (CIT 1994). The Department does not, however, offset interest expense with interest income earned on long-term investments because long-term interest income does not relate to current operations. See, e.g., Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany: Final Results of Antidumping Duty Administrative Review, 56 FR 31734 (July 11, 1991).... [W]e were able to determine the amount of short-term interest income for the consolidated IRI group ... and have applied short-term interest income as an offset to Dalmine's financing costs.

*Id.* at 31,991.

### 2

### The ITA Properly reduced IRI's Interest Expenses By Short–Term Interest Income Only

██ The Court rejects Dalmine's argument that the ITA's interest policy improperly treats the same categories of interest expense and interest income differently.

Dalmine states that the ITA is claiming that all of a respondent's debt (that is, both long- and short-term borrowings) is used to fund a "company's current operations," but only its short-term investments are related to current operations for offset purposes. Dalmine Brief at 83. Dalmine argues that the ITA should treat interest paid and interest received by a company in the same manner. *Id.* at 83–84. Dalmine concludes that long-term debt "fund[s] the company's current operations," and long-term interest income must also be taken into account in calculating a respondent's net interest expense. *Id.* at 84.

Commerce allows respondents to submit proof that interest on long-term investments is related to current operations. The respondent needs to show Commerce that there is "a nexus between the reported interest income" and its "manufacturing operation". *NTN Bearing Corp. v. United States*, 905 F.Supp. 1083, 1097 (CIT 1995).

The record shows that Dalmine did not provide sufficient evidence to demonstrate the nexus to convince Commerce to use a different method. *See* Final Determination, 60 Fed.Reg. at 31,990–91. The Court rejects Dalmine's claim that companies may be unable to establish a nexus between its reported long-term interest income and its ordinary operations because money is generally considered to be fungible, regardless of where it is sourced or applied, Dalmine Reply at 53–54, as speculative. The Court affirms Commerce's treatment of IRI's interest expenses as supported by substantial evidence on the record and in accordance with law.

### I

### The ITA's Rejection As New Information Of Certain Documents That Dalmine Submitted With Their Reply Brief In Response To Quanex's Case Brief Was Reasonable

Commerce rejected two sets of documents attached to Dalmine's reply brief as new information and refused to consider them, but allowed Dalmine to submit a reply brief with the "new" information deleted from it. Dalmine argues that "due process and fair-

ness required that they be given an opportunity to rebut new arguments advanced for the first time in [Quanex's] Case Brief." Dalmine Brief at 23–24. For the reasons that follow, Commerce's actions are upheld.

## 1

### Background

Quanex argued in its administrative case brief that Dalmine had improperly excluded certain sales of alloy pipe made for boiler tube application that was stenciled to ASTM A–335 specification. Quanex's Case Brief of May 18, 1995 at 3–10, AR Pub. Doc. 241, Fiche 43, Fr. 1–49. Even though this pipe was used in applications which were excluded from the scope, Quanex submitted that the scope of the petition made clear that "all A–335 pipe, regardless of end use is included in the scope of this investigation...." *Id.* at 4.

Dalmine attached to its reply brief two sets of documents which allegedly contradicted the "new" argument asserted by Quanex. Commerce required Dalmine to delete these documents and any references to them from its reply brief because they constituted "new information" under 19 C.F.R. § 353.31(a). Letter from the Director, Office of Antidumping Inves. to Rogers & Wells of May 30, 1995, AR Pub. Doc. 253, Fiche 49, Fr. 42. Dalmine's new version of its reply brief was in accordance with Commerce's instructions, and retained its rebuttal to Quanex's position with respect to scope. *See* Dalmine's Redacted Reply Brief, AR Pub. Doc. 255, Fiche 50, Fr. 1.

## 2

### The ITA Properly Rejected Certain Documents Attached To Dalmine's Reply Brief

■■■■ This Court has recognized that foreign respondents have a right to due process in antidumping proceedings. *Sugiyama Chain Co., Ltd. v. United States,* 18 CIT 423, 436, 852 F.Supp. 1103, 1115 (1994). This right is limited by the lack of a Constitutional right to import merchandise into the United States or to engage in foreign trade. *See American Ass'n of Exporters and Importers–Textile and Apparel Group v. United States,* 3 Fed. Cir. (T) 58, 71, 751 F.2d 1239,

1250 (1985) ("No one has a protectable interest to engage in international trade."). Consequently, parties simply have a right to the procedures set forth in the antidumping statute or in the agency regulations implementing that statute. *See Kemira Fibres Oy v. United States,* 18 CIT 687, 694, 858 F.Supp. 229, 235 (1994) ("judicial review of administrative determinations can only be meaningful under the due process clause of the Fifth Amendment if the reviews have been initiated in compliance with the procedures which Congress has set forth in statutes and which Commerce has implemented in its regulations.").

■■■■ The regulation concerning the submission of factual information reads, in part:

[S]ubmissions of factual information for the Secretary's consideration shall be submitted not later than:

(i) For the Secretary's final determination, seven days before the scheduled date on which the verification is to commence; . . . .

(3) The Secretary will not consider in the final determination or the final results, or retain in the record of the proceeding, any factual information submitted after the applicable time limit. The Secretary will return such information to the submitter with written notice stating the reasons for the return of the information.

19 C.F.R. § 353.31(a)(1) and (3).

After the Preliminary Determination is issued, Commerce allows an interested party to submit a "case brief". This brief must "separately present in full all arguments that continue in the submitter's view to be relevant to the Secretary's final determination . . ., including any arguments presented before the date of publication of the preliminary determination...." 19 C.F.R. § 353.38(c)(1) and (2). An interested party may also submit a "rebuttal brief" separately presenting in full all rebuttal arguments and "responding only to arguments raised in case briefs." 19 C.F.R. § 353.38(d).

In *Acciai Speciali Terni, S.p.A. v. United States,* Slip Op. 95–142, at 18, 1995 WL 476719 (CIT Aug. 7, 1995), this Court did not require the ITC to provide any opportunity to rebut factual information submitted after

the deadline for posthearing briefs even though the agency requested the information. Further, in *Timken Co. v. United States,* 12 CIT 955, 699 F.Supp. 300 (1988), the Court rejected a respondent's claim that it should have been given an opportunity to comment on a telex placed in the record eight days before publication of the final determination. The Court noted that the record contained many examples of respondent's involvement in the investigation which convinced the Court that respondent received adequate procedural rights. *Id.* at 966, 699 F.Supp. at 309.

Dalmine has received all the process that was due to it. The relevant regulation notifies the parties that Commerce will not consider untimely factual information. Commerce's policy of setting time limits on the submission of factual information is reasonable because Commerce "clearly cannot complete its work unless it is able at some point to 'freeze' the record and make calculations and findings based on that fixed and certain body of information." *Bowe–Passat v. United States,* 17 CIT 335, 339, 1993 WL 179269 (1993). There has been no unusual conduct by Commerce which deprived Dalmine of its due process rights. Indeed, Dalmine was permitted to submit a rebuttal brief in which Dalmine responded to Quanex's arguments. Consequently, the Court upholds Commerce's decision to reject as "new" the evidentiary material attached to Dalmine's rebuttal brief.

## IV

### CONCLUSION

For the foregoing reasons, this matter is remanded to Commerce with instructions that Commerce shall re-calculate the COP and CV with respect to DTI's galvanized products. Commerce's actions on all other issues contested in Dalmine's Motion For Judgment Upon The Agency Record are affirmed. Quanex's Motion For Judgment Upon The Agency Record is denied.

### ORDER

This case having come before the Court for decision, and the Court, after due delibera-

tion, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that this case is remanded to the Department of Commerce with instructions to recalculate COP and CV for the galvanized pipe produced by DTI; and it is further

ORDERED, ADJUDGED and DECREED that the remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due; and it is further

ORDERED, ADJUDGED and DECREED that Dalmine's Motion For Judgment Upon The Agency Record is denied in all other respects; and it is further

ORDERED, ADJUDGED and DECREED that Gulf States Tube Division of Quanex Corporation's Motion For Judgment Upon The Agency Record is denied; and it is further

ORDERED, ADJUDGED and DECREED that all parties shall review the Memorandum and Order and notify the Court on or before September 18, 1997 whether any information contained in the Memorandum and Order is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter. If a party determines that no information needs to be deleted that party shall so notify the Court on or before September 18, 1997.